# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **MATTHEW MILLER**, | **Case No.: 3:10-CV-01027-SI** |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| **MICHAEL J. ASTRUE**, Commissioner of Social Security | |
| Defendant. | |

TIM D. WILBORN
Wilborn Law Office, P.C.
P.O. Box 2768
Oregon City, OR 97045

      Of Attorneys for Plaintiff

AMANDA MARSHALL
United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR  97204-2902

SUMMER STINSON
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

      Of Attorneys for Defendant

**SIMON, District Judge.**

## I. INTRODUCTION

Matthew S. Miller ("Mr. Miller") brings this action under 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability insurance benefits (DIB) and supplemental security income (SSI) benefits.  This court has jurisdiction under 42 U.S.C. § 405(g).

Mr. Miller contends that the Commissioner: (1) improperly rejected the expert medical opinions of Dr. Minter; (2) improperly disregarded Mr. Miller's testimony; (3) improperly disregarded lay witness testimony; and (4) posed an invalid vocational hypothetical to the vocational expert. The court accepts Mr. Miller's first and last arguments and rejects his second and third arguments. The court therefore reverses the Commissioner's decision and remands the case to the Commissioner. On remand, the Commissioner should: (1) provide specific and legitimate reasons for crediting the opinion of one treating source over another; and (2) include in his vocational hypothetical(s) all relevant limitations supported by substantial evidence.

## II. BACKGROUND

**A.      Procedural History**

Mr. Miller has worked as a security officer, a plastic injection molding machine operator, and a laborer at various manufacturing companies. Tr. 107. Mr. Miller was born in 1966 and applied for DIB and SSI on August 2, 2004. Tr. 13, 56, 404. He alleged that he had been disabled beginning November 30, 2002, due to back pain and mental health problems. Tr. 78-79, 84. After his claims were denied initially and upon reconsideration, Mr. Miller requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 13. ALJ Thomas P. Tielens held a hearing on

May 14, 2007, and denied Mr. Miller's claims on June 7, 2007. Tr. 13, 21. The Appeals Council

denied Mr. Miller's request for review, after which he filed a timely appeal in the U. S. District

Court for the District of Oregon. *Miller v. Astrue*, No. 6:08-CV-518-HO (D. Or. Apr. 4, 2009);

Tr. 5, 484-85. On April 4, 2009, pursuant to stipulation by the parties, U.S. District Judge

Michael R. Hogan reversed and remanded the case to the agency for further proceedings.

Tr. 484-87. On April 20, 2009, the Appeals Council vacated the Commissioner's final decision

and remanded the case to ALJ Richard A. Say. Tr. 488. ALJ Say conducted a new hearing on

March 8, 2010, and issued a decision denying Mr. Miller's claims on May 6, 2010. Tr. 474, 483.

Because the Appeals Council did not assume jurisdiction after ALJ Say's decision, that decision

became the final decision of the Commissioner. 20 C.F.R. § 404.984(a); s*ee Petty v. Astrue*, 550

F.Supp.2d 1089, 1096 (D. Ariz. 2008) ("Because . . . the Appeals Council has not assumed

jurisdiction on its own motion, the ALJ's decision denying [the claimant's] request for benefits

constitutes a final decision for purposes of Section 405(g) jurisdiction."). Mr. Miller then filed a

complaint in this court.

**B.      Medical Evidence of Impairment**

To establish that a claimant is disabled and eligible for benefits, the claimant "must

produce complete and detailed objective medical reports of [his] condition from licensed medical

professionals." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995); 20 C.F.R. § 404.1513(a).

Mr. Miller has sought treatment from numerous physicians for his chief complaints, which are

back pain and depression.

Mr. Miller underwent a partial hemilaminectomy[1] and diskectomy[2] from the right L5-S1

space on June 29, 1999. Tr. 400. Mr. Miller continued to be treated periodically for back pain by

---

[1] A hemilaminectomy is the "surgical removal of the lamina of the vertebral arch on one side." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1039-40 (Donald Venes et al. eds. 2009).

numerous doctors from June 1999 through at least 2009. Tr. 375-403, 530-599. On June 16, 2000, Dr. Jeffery Pierson, M.D., who treated Mr. Miller from January 2000 through June 2000, opined that Mr. Miller was medically stationary and should be permanently restricted to repetitive lifting of 35 pounds and occasional lifting of 45 pounds. Tr. 379-86. An MRI of Mr. Miller's lumbar spine taken February 26, 2001, by Dr. J. McAndrew Jones, M.D., showed degenerative disc disease involving the three lower lumbar spaces, as well as midline disc deformities at L3-4 and L4-5 suggesting disc protrusion at the L4-5 space on the right. Tr. 240. A CT scan of Mr. Miller's lumbar spine taken June 26, 2001, by Dr. Jones showed a mild reduction in canal circumference and mild annular bulging at L3-4; broad-based annular bulging and slight stenosis at L4-5; and "[p]ost-surgical changes" at L5-S1. Tr. 239.

On October 23, 2003, Dr. Craig Thompson, M.D., who treated Mr. Miller during October and November 2003, treated Mr. Miller for lower back pain after he lifted three 50-pound bags of sugar at work. Tr. 162-67. On November 6, 2003, Dr. Thompson noted, "He does try to keep his lifting to about 35 pounds and below because of his chronic back problems, but he does not have any documentation that he needs to stay that way. . . .". Tr. 164.

An x-ray of Mr. Miller's lumbar spine taken March 7, 2004, by Dr. Gerald S. Green, M.D., showed mild disc space narrowing at L5-S1 and normal disc spaces elsewhere. Tr. 255. On June 8, 2004, Dr. Mikeanne Minter, M.D., who treated Mr. Miller's back pain from March 2004 to August 2004, treated Mr. Miller for lumbar strain after he hurt his back changing oil. Tr. 175-91, 241-49. Dr. Minter advised Mr. Miller to avoid lifting or prolonged standing or walking for 10 days. Tr. 191-92. An MRI of Mr. Miller's lumbar spine taken June 19, 2004, by Dr. Jones and compared with the 2001 MRI showed "evidence of progression of degenerative

---

[2] A diskectomy is the "[s]urgical removal of a herniated intervertebral disk." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 671 (Donald Venes et al. eds. 2009).

disease, with further loss of disc space height at levels 3-4, and 4-5, and annular bulging has increased at the lumbosacral level. There is, however, no significant canal stenosis, and there is no disc protrusion identified." Tr. 229. On June 28, 2004, Mr. Miller again saw Dr. Minter regarding his back pain, which he said was radiating down his right leg. Tr. 187. Mr. Miller had an antalgic gait and "some tenderness with [the] straight leg test on the right." Tr. 187.

On July 28, 2004, Dr. Minter completed the Oregon Department of Human Services' Functional Limits Assessment form for Mr. Miller. Tr. 171-72. In the form, she stated that Mr. Miller suffered from "low back and leg pain with osteoarthritis of lumbar spine and a history of laminectomy in 1999." Tr. 171. She opined that Mr. Miller "should not do work requiring bending, climbing, or lifting more than 10 pounds at a time, and should not do any repetitive lifting, even if less than 10 pounds." Tr. 172. Dr. Minter also opined that Mr. Miller should not sit in a chair for more than two hours without a 10-15 minute break to stand and stretch. Tr. 171-72. Aside from these limitations, Dr. Minter opined that Mr. Miller could participate in job search and job readiness programs for up to 30 hours per week. Tr. 171-72.

Mr. Miller's back pain has been treated with a variety of medications, including Flexeril, naproxen, ibuprofen, trazodone, Toradol injections, Vicodin, Methadone, OxyContin, and morphine. Tr. 185, 206, 214, 220, 285. Multiple doctors reported drug-seeking behavior from Mr. Miller during 2001 and 2006. Tr. 220-21, 228, 360. Mr. Miller's back pain was treated with varying levels of success with Methadone from 2006-2008. Tr. 354-67, 565. During several 2008 office visits, family nurse practitioner Jessica Jimenez noted that Methadone stabilized Mr. Miller's back pain. Tr. 554, 557.

Mr. Miller was also treated for depression periodically from 2001 through at least 2007. Tr. 215-16, 307. On January 17, 2005, Dr. Gary Sacks, Ph.D., a psychologist, evaluated

Mr. Miller at the request of Adult and Family Services officials. Tr. 277. Dr. Sacks observed that

Mr. Miller's "affect was exaggerated and he was easily overcome with emotions. . . . He

described concentration and memory difficulties in excess of observed impairment." Tr. 278.

Mr. Miller's score on the Beck Depression Inventory[3] "reveals a mild level of depression

evidenced by feelings of sadness, pessimism, loss of pleasure, self-dislike, agitation, loss of

energy and concentration difficulty." Tr. 282. Mr. Miller's depression was treated with Paxil and

Cymbalta. Tr. 253, 585.

## C.    Other Evidence of Impairment

Mr. Miller may also "use evidence from other sources to show the severity of [his]

impairment(s) and how it affects [his] ability to work." 20 C.F.R. § 404.1513(d). Mr. Miller and

his wife, Ruth Miller, each offered written and oral testimony regarding Mr. Miller's

impairments. The most recent testimony is the oral testimony at the 2010 hearing before ALJ

Say. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001) (holding that more recent

medical reports are more probative). Mr. Miller testified at the 2010 hearing that his most serious

impairments were nausea, back pain, and memory problems. Tr. 619. He stated that he was able

to read and understand newspaper articles, help his wife with grocery shopping, count change at

the store, and drive a car. Tr. 619-22. He stated that he was unable to wash his lower half without

assistance. Tr. 621. He testified that he could sit for 15 minutes before needing to stand up and

move around. Tr. 626. He testified that he could stand for five minutes. Tr. 626. He stated that he

could walk for half a mile, but then revised his estimate to two blocks. Tr. 626.  He testified that

his 1999 back operation relieved the pain in his legs and temporarily relieved his back pain.

---

[3] The Beck Depression Inventory is a "scale of 21 items designed to provide a quantitative assessment of depressive disorders. The subject is asked to rate each statement on a scale from zero to three to indicate the severity of depression." CAMPBELL'S PSYCHIATRIC DICTIONARY 120 (Robert Jean Campbell, M.D., ed. 2009).

Tr. 627. He stated that he quit his crime-scene security guard job in 2003 because he was having panic attacks due to the "smell of death." Tr. 523.

At the 2010 hearing, Ruth Miller testified that her husband could walk a mile, but then said she was not sure how far a mile was and said that he could only walk a block or two. Tr. 35-36. She testified that he tries to help her with housework like laundry, but that she carries the grocery bags when they go shopping. Tr. 636. She also testified that his back pain makes it difficult for him to sleep. Tr. 636-37.

### III. DISABILITY DETERMINATION AND STANDARDS

#### A.    Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520). The *Keyser* court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform? *Id.* at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).

The claimant bears the burden of proof for the first four steps in the process. If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled. *Bustamante v. Massanari*, 262 F.3d at 949, 953-54 (9th Cir. 2001); *see Bowen v. Yuckert*, 482 U.S. 137, 140-41

(1987); 20 C.F.R. §§ 404.1520(g) (setting forth general standards for evaluating disability), 404.1566 (describing "work which exists in the national economy").

The ALJ bears the burden of proof at step five of the process, where the ALJ must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the ALJ fails to meet this burden, then the claimant is disabled, but if the ALJ proves the claimant is able to perform other work that exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f)); *Tackett*, 180 F.3d at 1098-99.

**B.      The ALJ's Decision**

ALJ Say applied the five-step sequential disability determination process set forth in 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ found that Mr. Miller was not engaged in substantial gainful activity. Tr. 476.

At step two, the ALJ found that Mr. Miller had been treated or evaluated for the following symptoms and complaints: post lumbar laminectomy with disc degeneration; shoulder, wrist, and knee pain; hernia; gastrointestinal symptoms; and depression. Tr. 476-77. The ALJ found that only the post lumbar laminectomy with disc degeneration qualified as a "severe" impairment under 20 C.F.R. §§ 404.1520(c), 416.920(c). Tr. 476-77. The ALJ found that x-rays of Mr. Miller's knees and right wrist "did not display any acute injury," and that his treatment providers reported that his wrist and shoulder pain have been "resolved." Tr. 477. The ALJ noted that Mr. Miller's hernia, which he has had since 2006, "pop[s] out" when he uses the bathroom, but that there were no additional symptoms. Tr. 477. The ALJ found that with medication and proper diet, Mr. Miller's gastrointestinal symptoms were resolved. Tr. 477. The ALJ also found

OPINION AND ORDER – Page 8

that Mr. Miller's depression "does not cause more than minimal limitations in the claimant's ability to perform basic mental work activities and is therefore nonsevere." Tr. 477.

At step three, the ALJ concluded that Mr. Miller did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Sub-pt. P, Appx. 1. Tr. 478.

The fourth and fifth steps require the ALJ to determine how the claimant's impairments affect his ability to perform work. To make this determination, the ALJ formulates the claimant's residual functional capacity ("RFC"). An RFC "is the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). An RFC "is used at step 4 of the sequential evaluation process to determine whether an individual is able to do past relevant work, and at step 5 to determine whether an individual is able to do other work, considering his or her age, education, and work experience." Social Security Ruling ("SSR") 96-8p.[4]

In formulating a claimant's RFC, the ALJ must follow a two-step process. SSR 96-4p. First, he must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. *Id.* If the ALJ finds that the first step is satisfied, he must then determine the extent to which the claimant's symptoms limit his functioning. *Id.* The ALJ found that Mr. Miller's medically determinable impairments could reasonably be expected to cause the symptoms to which he testified (back pain, nausea, insomnia, difficulty concentrating, memory loss, fatigue, depression, constipation, weight loss), but that Mr. Miller's statements regarding the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the RFC that the ALJ formulated. Tr. 479-80.

---

[4] The Commissioner publishes rulings to clarify the Social Security Administration's regulations and policy. *See Bunnell v. Sullivan*, 947 F.2d 341, 346 n.3 (9th Cir. 1991) (*en banc*). Although they do not carry the force of law, SSRs are binding on ALJs. *Bray v. Comm'r*, 554 F.3d 1219, 1224 (9th Cir. 2009).

The ALJ concluded that Mr. Miller retained an RFC for "modified light work" as defined in 20 C.F.R. § 404.1567(b). Tr. 479. "Light work" is defined as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Jobs involving light work may require "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* The ALJ also added the following modifications, specific to Mr. Miller, to the description of "light work": "He should never climb ladders, ropes or scaffolds. He can occasionally climb ramps and stairs. He can occasionally stoop, kneel, crouch and crawl. He can occasionally perform overhead work with his left upper extremity. He is able to understand, remember and carry out short simple instructions. He can also perform some lower end semi-skilled tasks with complex instructions." Tr. 479.

After the ALJ has formulated the claimant's RFC, he must consider whether the claimant can, in light of that RFC, perform past or other work. To do so, the ALJ may rely on the testimony of a vocational expert ("VE"). 20 C.F.R. §§ 404.1560(b)(2), 404.1566(e). Typically, the ALJ asks the VE whether, given certain hypothetical assumptions about the claimant's capabilities, "the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy." *Burkhart v. Bowen*, 856 F.2d 1335, 1340 n.3 (9th Cir. 1988). In response, the "VE must identify a specific job or jobs in the national economy having requirements that the claimant's physical and mental abilities and vocational qualifications would satisfy." *Osenbrock*, 240 F.3d at 1162-63.

The ALJ called a VE to testify during the hearing. The VE testified that Mr. Miller's past relevant work as a security guard, a hand packager, and an injection molding machine operator is generally performed at a light exertional level. Tr. 482. The VE testified that a person with

Mr. Miller's RFC could perform these three jobs. Tr. 482. Consequently, at step four, the ALJ found that Mr. Miller retained the capacity to perform his past work. Tr. 482. Accordingly, the ALJ found that Mr. Miller was not disabled. Tr. 482-83.

In his decision, the ALJ noted that Mr. Miller's attorney proposed a more restrictive RFC, limiting a person to "less than sedentary exertional work that involves only simple tasks and includes a reduction in productivity of 20 percent compared to the average worker due to limited concentration, persistence or pace." Tr. 482. The VE testified that with these additional restrictions, Mr. Miller would not be able to perform his past relevant work, but that he would be able to perform other unskilled sedentary work, such as small production assembly work and sedentary packaging and sorting work. Tr. 482.

## IV. STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

## V. DISCUSSION

In his brief, Mr. Miller argues that the ALJ: (1) improperly rejected the expert medical opinions of Dr. Minter; (2) improperly disregarded Mr. Miller's testimony; (3) improperly disregarded lay witness testimony; and (4) posed an invalid vocational hypothetical to the

vocational expert. The court accepts Mr. Miller's first and last arguments and rejects his second and third arguments.

## A.    Dr. Minter's Opinion

### 1.    Legal Standards

The ALJ "is responsible for resolving conflicts in the medical record." *Carmickle v. Comm'r*, 533 F.3d 1155, 1164 (9th Cir. 2008). As part of that responsibility, the ALJ must determine the weight to give each source of evidence. 20 C.F.R. § 404.1527(d), (f); 20 C.F.R. § 416.927(d), (f). "Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. §§ 404.1502, 416.902. If the opinion of a treating source is contradicted by the opinions of other medical sources, including other treating sources, the ALJ may only reject that opinion if he provides " 'specific and legitimate reasons' supported by substantial evidence in the record." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)). The ALJ " 'can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.' " *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

### 2.    Analysis

Mr. Miller asserts that the ALJ improperly discounted the opinion of Dr. Minter, one of Mr. Miller's treating physicians. Pl. Br. 12-13. On July 28, 2004, Dr. Minter completed a Functional Limits Assessment form for Mr. Miller. Tr. 171-72. In the form, she stated that Mr. Miller suffered from "low back and leg pain with osteoarthritis of lumbar spine and a history

of laminectomy in 1999." Tr. 171. She opined that Mr. Miller "should not do work requiring bending, climbing, or lifting more than 10 pounds at a time, and should not do any repetitive lifting, even if less than 10 pounds." Tr. 172. Dr. Minter also opined that Mr. Miller should not sit in a chair for more than two hours without a 10-15 minute break to stand and stretch. Tr. 171-72. Aside from these limitations, Dr. Minter opined that Mr. Miller could participate in job search and job readiness programs for up to 30 hours per week. Tr. 171-72. The ALJ gave Dr. Minter's Functional Limits Assessment opinion "little weight." Tr. 481.

Mr. Miller argues that the ALJ had to identify clear and convincing reasons for discounting Dr. Minter's opinion. This elevated standard, however, applies only when an ALJ is rejecting the uncontradicted opinion of a treating physician. *Lester*, 81 F.3d at 830. Here, Dr. Pierson's opinion contradicts Dr. Minter's opinion. When one treating source contradicts another, the ALJ needed only provide specific and legitimate reasons, supported by substantial evidence, for crediting one over the other. *See id.* (explaining standards for weighing medical source testimony).

The ALJ's decision to reject Dr. Minter's opinion is not supported by specific and legitimate reasons. The ALJ gave Dr. Minter's Functional Limits Assessment opinion "little weight" for three reasons. Tr. 481. First, Dr. Minter did not provide an end date for the restrictions she recommended for Mr. Miller. Tr. 481. This is not a legitimate reason to give "little weight" to Dr. Minter's opinion; given the chronic nature of Mr. Miller's back problems, any restrictions a doctor would recommend would likely be longstanding.

The second reason the ALJ gave for discounting Dr. Minter's opinion is that "other treating sources closer to, but after, the date of the claimant's back surgery actually provided higher functional estimates than assessed by Dr. Minter." Tr. 481. In June 2000, one year after

OPINION AND ORDER – Page 13

Mr. Miller's back surgery, but still before his alleged November 2002 onset date, Dr. Pierson

opined that Mr. Miller could work "in the light to medium category of work" with no repetitive

lifting of more than 35 pounds and no single lifts of more than 45 pounds. Tr. 379. In November

2003, Dr. Thompson, who treated Mr. Miller for lumbar strain after he lifted several 50 pound

bags of sugar, noted that Mr. Miller said he was supposed to limit his repetitive lifting to 35

pounds, but that he had no documentation showing such a restriction. Tr. 164-65. Dr. Thompson

also noted that Mr. Miller had returned to his pre-injury status. Tr. 376. The ALJ found no

objective evidence of changes in Mr. Miller's neurological or general physical status since

Dr. Pierson and Dr. Thompson issued their opinions. Tr. 481-82. Therefore, the ALJ found little

support for the significant additional restrictions imposed by Dr. Minter's 2004 opinion. Tr. 482.

Mr. Miller argues that the ALJ erred in finding no objective evidence of changes in

Mr. Miller's neurological or physical health since the opinions of Dr. Pierson and Dr. Thompson

in 2000 and 2003, respectively.[5] Pl. Br. 13. The court agrees. Evidence demonstrates that

Mr. Miller's condition deteriorated following Dr. Pierson's and Dr. Thompson's assessments.

An MRI taken on June 19, 2004, showed "evidence of progression of degenerative disease, with

further loss of disc space height at levels 3-4, and 4-5, and annular bulging has increased at the

lumbosacral level." Tr. 229. This MRI constitutes objective evidence that Mr. Miller's disc

disease had worsened since his previous MRI, on June 26, 2001. Tr. 229. The ALJ therefore

erred when he found that there was no objective evidence of changes in Mr. Miller's

neurological or physical examinations. Consequently, the ALJ's second reason for rejecting

Dr. Minter's opinion—that there had been no objective changes in Mr. Miller's condition since

an earlier opinion from another treating source, Dr. Pierson—was not legitimate.

---

[5] The court notes that Dr. Thompson did not actually recommend a weight lifting limitation for Mr. Miller; he simply noted that Mr. Miller tried to limit his lifting to 35 pounds but did not have any documentation that that limitation was permanent. Tr. 164.

OPINION AND ORDER – Page 14

The third reason given by the ALJ for discounting Dr. Minter's opinion is that state agency physicians opined that although Mr. Miller's impairments "could reasonably cause pain and functional loss," his neurological examinations were normal and his mobility limitations were not supported by the record. Tr. 482. The ALJ acknowledged that although the opinions of non-examining physicians do not generally deserve as much weight as those of examining or treating physicians, the opinions of these physicians did deserve some weight because they were consistent with the record as a whole. Tr. 482. In the absence of any independent reasons for rejecting Dr. Minter's opinion in favor of Dr. Pierson's opinion, however, the opinions of the state agency physicians cannot constitute substantial evidence for rejecting Dr. Minter's opinion. *Lester*, 81 F.3d at 831 (9th Cir. 1995) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician.").

Mr. Miller also argues that the ALJ improperly rejected Dr. Minter's weight lifting recommendations in lieu of Dr. Pierson's weight lifting recommendations. Pl. Br. 13; Tr. 172, 379. According to Mr. Miller, the record demonstrates that when he exceeded Dr. Minter's weight lifting recommendations, he injured himself. Pl. Br. 13. Mr. Miller's 2003 injury, however, occurred after he had repeatedly lifted bags of sugar weighing 50 pounds each. Tr. 378. This lifting exceeded both Dr. Minter's and Dr. Pierson's weight lifting recommendations. Therefore, we cannot know whether Mr. Miller would have injured himself if he had abided by Dr. Pierson's recommendations.

In conclusion, the ALJ's decision to reject Dr. Minter's 2004 opinion was not based on specific and legitimate reasons supported by substantial evidence. *See Lester*, 81 F.3d at 830. The court remands this case to the Commissioner. Upon remand, the Commissioner should

explain whether or not he continues to credit Dr. Pierson's and Dr. Thompson's opinions over Dr. Minter's opinions. Regardless of which physicians' opinions he credits, the Commissioner should provide specific and legitimate reasons, supported by substantial evidence, for his conclusion.

### B.    Mr. Miller's Credibility

#### 1.    Legal Standards

The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's testimony about the severity and limiting effect of his symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). When doing so, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, "if the claimant meets the first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill*, 12 F.3d at 918. If, on the other hand, there is affirmative evidence of malingering,[6] then the ALJ may reject the claimant's symptom testimony by making a credibility

---

[6] A malingerer is "[o]ne who pretends to be ill or suffering from a nonexistent disorder to arouse sympathy" or "[o]ne who pretends slow recuperation from a disease once suffered in order to continue to receive benefits of

determination stating why the testimony is unpersuasive. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). In making such a credibility determination, the ALJ "must specifically identify what testimony is credible and what testimony undermines the claimant's complaints. . . .". *Id.* (citations omitted in original).

The Social Security Administration and the Ninth Circuit have set forth a variety of tools that an ALJ may use to assess a claimant's credibility. In SSR 96-7p,[7] the Commissioner recommended assessing the claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms.

In addition to the factors identified in SSR 96-7p, the Ninth Circuit has suggested that an ALJ "may consider . . . ordinary techniques of credibility evaluation, such as the reputation for lying, prior inconsistent statements concerning the symptoms, . . . other testimony by the claimant that appears less than candid [and] unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen*, 80 F.3d at 1284.

### 2.    Analysis

The ALJ found that Mr. Miller satisfied step one of the credibility inquiry because his medically determinable impairments could reasonably be expected to cause his alleged symptoms. Tr. 480. At step two, however, the ALJ found that Mr. Miller's "statements

---

medical insurance and work absence." TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1396 (Donald Venes et al. eds. 2009).
[7] The Commissioner published SSR 96-7p in part "to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision."

concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. 480. Mr. Miller asserts that the ALJ improperly rejected his symptom testimony. Pl. Br. 14-15.

Mr. Miller argues that there is no evidence of malingering in his case, and that therefore the ALJ must provide clear and convincing reasons for rejecting his symptom testimony. Pl. Br. 14-15. However, the record contains numerous examples of Mr. Miller exaggerating his symptoms, and therefore, the lesser standard discussed in *Greger* applies. For instance, on May 7, 2001, Dr. Zaugra wrote, "He prefers to walk slightly hunched; however, he walks straight-up after leaving the building." Tr. 216. In July or August 2004, Dr. Minter wrote, "Pt's pain mannerisms are extremely dramatic. He grabs his back suddenly [with] different arms (alternate and at different sites)." Tr. 184. On August 3, 2004, treatment notes state, "Crying hysterically about not being able to look for work – 'Nobody will hire me like this.' Also upset he had drug test ordered." Tr. 176. The ALJ also noted that "the records show the claimant displays in [sic] significant exaggerations of his symptoms and limitations." Tr. 481. On May 4, 2005, a treatment provider wrote, "Display of pain appears excessive for the patient's condition." Tr. 311. This evidence—by no means an exhaustive recitation—demonstrates that there was affirmative evidence that Mr. Miller was malingering. The ALJ acknowledged that the record shows that Mr. Miller exaggerates his symptoms and limitations. Tr. 481. Accordingly, the ALJ need only identify which testimony is credible and which testimony undermines Mr. Miller's credibility. *Greger*, 464 F.3d at 972.

The ALJ has satisfied this standard. The ALJ found that Mr. Miller had been inconsistent in his claims of leg pain. Tr. 480. The ALJ also found that Mr. Miller's allegation that he suffered from body odor because he could not bend to wash his lower half was contrary to prior

OPINION AND ORDER – Page 18

reports by Mr. Miller and Ruth Miller that he was able to groom himself. Tr. 480. The ALJ noted

that Mr. Miller worked as a security guard after his alleged onset date, from April 2002 through

February 2003, and that he was on his feet the whole day. Tr. 481. In addition, the ALJ noted

that there is evidence that Mr. Miller stopped working as a security guard for reasons unrelated

to his allegedly disabling impairments. Tr. 480-81 (noting that Mr. Miller "reported that he

stopped work because he was having panic attacks due to 'the smell of death' "). Finally, as

noted above, many treatment providers stated that Mr. Miller's pain displays were exaggerated,

given that x-rays and MRIs showed only mild impairments. Tr. 481. Thus. the ALJ has

adequately explained which evidence caused him to doubt Mr. Miller's credibility.

**C.      Lay Witness Evidence**

      **1.      Legal Standards**

      Social Security regulations require the ALJ to consider all relevant evidence. 20 C.F.R.

§ 416.945(a)(3). This includes evidence submitted by family members, such as Mr. Miller's

wife, Ruth Miller. 20 C.F.R. § 404.1513(d)(4); *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th

Cir. 1993) (family members competent to testify as to claimant's condition). Opinions from lay

witnesses, such as family members, may be accorded less weight than opinions from acceptable

medical sources. *Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996). An ALJ, however, may

not disregard lay witness testimony "unless he or she expressly determines to disregard such

testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d

503, 511 (9th Cir. 2001).

      **2.      Analysis**

      The ALJ found that although Ruth Miller's statements regarding Mr. Miller's symptoms

and limitations were "likely honest," "the records show the claimant displays in [sic] significant

exaggeration of his symptoms and limitations. Therefore Mrs. Miller's statements alone fail to substantiate the claimant's disability." Tr. 481. Mr. Miller argues that the ALJ improperly discounted Ruth Miller's testimony by failing to provide germane reasons for doing so, and because "[i]t is highly unlikely that Plaintiff could live in the same household with the lay witness over a period of years and fool her into thinking he was in more pain than he is." Pl. Br. 19.

The court finds that the ALJ provided sufficient reasons for discounting Ruth Miller's testimony. The Ninth Circuit has held that if an ALJ provides sufficient reasons for rejecting a claimant's subjective complaints, and then rejects a lay witness's similar testimony for the same reason, it follows that the ALJ has also provided sufficient reasons for rejecting the lay witness's testimony. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009). Here, the ALJ explained that Mr. Miller has a history of exaggerating his symptoms and limitations. Tr. 481. Therefore, he found that Ruth Miller's observations, while likely truthful, were not sufficient to substantiate Mr. Miller's claim of disability. Tr. 481. This is a rational interpretation of the evidence, and consequently must be upheld.

**D.      Vocational Hypothetical**

**1.      Legal Standards**

An ALJ may rely on the testimony of a VE to determine whether a claimant retains the ability to perform work. *Osenbrock*, 240 F.3d at 1162. "[I]n hypotheticals posed to a vocational expert, the ALJ must only include those limitations supported by substantial evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006). "If the record does not support the assumptions in the hypothetical, the vocational expert's opinion has no evidentiary value." *Lewis*, 236 F.3d at 518.

### 2.    Analysis

In posing his vocational hypothetical to the VE, the ALJ described an individual who is 43 years old; who has a 10th grade education; who is able to read, write, and do simple math; who is limited to light exertional activities; who should never climb ladders, ropes, or scaffolds; who can occasionally climb ramps and stairs; who can occasionally stoop, kneel, crouch, and crawl; who can occasionally do overhead work with the left upper extremity; and who can understand, remember, and carry out short, simple instructions. Tr. 637. Mr. Miller alleges that the VE's opinion regarding Mr. Miller's RFC is invalid because in posing his hypothetical questions to the VE, the ALJ "omitted Plaintiff's credible allegations and those of the lay witness, Ruth Miller, including Plaintiff's inability repetitively to use his right hand, lift more than 5 pounds, or bend. The ALJ improperly omitted the restrictions on lifting and bending assessed by Dr. Minter." Pl. Br. 20.

As a result of this court's finding *supra* at Section V.A.2. that the ALJ did not provide adequate reasons for crediting Dr. Pierson's opinion over Dr. Minter's opinion, this court finds that the ALJ improperly omitted Dr. Minter's 2004 restrictions from the vocational hypothetical he posed to the VE. *See* Tr. 638-39. Consequently, the VE's opinion lacks evidentiary value. *Lewis*, 236 F.3d at 518. On remand, the ALJ should provide specific and legitimate reasons for crediting one treating source's opinion over another and should include all limitations supported by substantial evidence in his vocational hypothetical(s). *See Robbins*, 466 F.3d at 886.

Mr. Miller also argues that the ALJ erred by failing to include the limitations asserted by Mr. Miller and Ruth Miller in his vocational hypothetical. Pl. Br. 19-20. As explained above, the ALJ properly discounted that evidence, and therefore properly excluded it from his vocational hypothetical. *See Robbins*, 466 F.3d at 886.

## VI. CONCLUSION

The court reverses the Commissioner's decision and remands the case to the Commissioner. On remand, the Commissioner should: (1) provide specific and legitimate reasons for crediting the opinion of one treating source over another; and (2) if necessary, hold a new hearing to take additional testimony from a VE.

The Commissioner's decision is REVERSED and the case is REMANDED for further proceedings consistent with the instructions described above.

IT IS SO ORDERED.

Dated this 7th day of December, 2011.


/s/ Michael H. Simon
Michael H. Simon
United States District Judge